Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

RIČARDAS BARDAUSKAS,
derivatively on behalf of JASPER
THERAPEUTICS, INC.,

        Plaintiff,

        v.

RONALD A. MARTELL, HERBERT C.
CROSS, EDWIN TUCKER, SCOTT
BRUN, KURT VON EMSTER, VISHAL
KAPOOR, SVETLANA LUCAS,
CHRISTIAN W. NOLET, JUDITH
SHIZURU, and TOM WIGGANS,

        Defendants,

    and

JASPER THERAPEUTICS, INC.,

        Nominal Defendant.

Case No.:

**DEMAND FOR JURY TRIAL**

**<u>VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT</u>**

## INTRODUCTION

Plaintiff Ričardas Bardauskas ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Jasper Therapeutics, Inc. ("Jasper" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Ronald A. Martell ("Martell"), Herbert C. Cross ("Cross"), Edwin Tucker ("Tucker"), Scott Brun ("Brun"), Kurt von Emster ("Emster"), Vishal Kapoor ("Kapoor"), Svetlana Lucas ("Lucas"), Christian W. Nolet ("Nolet"), Judith Shizuru ("Shizuru"), and Tom Wiggans ("Wiggans") (collectively, the "Individual Defendants," and together with Jasper, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Jasper, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Martell, Cross, and Tucker for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Jasper, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from November 30, 2023 through July 3, 2025, inclusive (the "Relevant Period").

2.     Jasper is a clinical-stage biotechnology company headquartered in Redwood City, CA. The Company develops therapeutic products intended to treat mast cell driven diseases such as Chronic Inducible Urticaria ("CIndU"), Chronic Spontaneous Urticaria ("CSU"), and Asthma. To that end, Jasper develops therapeutic products intended to target diseased hemopoietic stem cells. The Company's lead product candidate is briquilimab, a "monoclonal antibody designed to block stem cell factor ("SCF") from binding to and signaling through the CD117 ("c-Kit") receptor on mast and stem cells."[1] In November 2023, the Company initiated its Phase 1b/2a clinical study of subcutaneous briquilimab as a treatment for CSU (the "BEACON Study").

3.     Jasper does not currently possess or operate manufacturing facilities. Instead, the Company utilizes third-party manufacturers to produce its drug candidates, "in accordance with cGMP regulations for use in [its] clinical studies."[2]  According to the Company's Annual Report on Form 10-K filed with the SEC on February 28, 2025 (the "2024 10-K"), cGMP regulations institute a number of procedural and documentary requirements concerning record keeping, personnel and quality control, and production processes and controls.

4.     In November 2019, the Company entered into an agreement with Lonza Sales AG ("Lonza") concerning the manufacture and product quality testing of briquilimab.

5.     Throughout the Relevant Period, the Individual Defendants made a series of materially false and misleading statements, failing to disclose the true nature of its inadequate oversight over third-party manufacturers' production of its drugs, and the effect such inadequate oversight would have on clinical trials.

6.     For instance, on November 30, 2023, the Company issued a press release to announce the first patient dosing in its Phase 1b/2a Clinical Study of Briquilimab in Chronic Spontaneous Urticaria (the "November 30, 2023 Press Release"). The November

---

[1] Jasper Therapeutics, Inc., ANNUAL REPORT (FORM 10-K), at 1 (Feb. 28, 2025).
[2] *Id.* at 11.

30, 2023 Press Release noted, *inter alia*, that "[r]esults from the [clinical study] trial should also allow [the Company] to determine doses and dosing regimens for future registrational studies in the broader CSU patient population."

7.    The truth emerged on July 7, 2025, when Jasper issued a press release titled "Jasper Therapeutics Reports Clinical Data Update from Briquilimab Studies in Chronic Spontaneous Urticaria" (the "July 7, 2025 Press Release"). The July 7, 2025 Press Release reported, *inter alia*, that results from the BEACON Study were confounded by one of the drug products used. The July 7, 2025 Press Release also noted impending cost-cutting measures to account for the BEACON Study's delay. Market analysts took note that same day, such as BMO Capital Markets which published a report titled "Downgrade to Mkt; Manuf Issue Adds High Uncertainty to an Already Ambiguous Story."

8.    Following this announcement, the price of the Company's stock fell $3.73, or approximately 55.1%, from a closing price of $6.77 per share on July 3, 2025, to close at $3.04 per share on July 7, 2025.

9.    Shortly after this revelation, on July 9, 2025 Company issued a subsequent press release titled "Jasper Therapeutics Announces Corporate Reorganization and Other Cost Cutting Measures to Extend Cash Runway" (the "July 9, 2025 Press Release"). Notably, the Company announced that it had reduced its workforce by roughly 50% of its current employees. The July 9, 2025 Press Release further conveyed that to prioritize the development of briquilimab as a treatment for chronic urticaria, the Company would pause its other clinical and preclinical programs such as the ETESIAN and SCID studies. Moreover, the July 9, 2025 Press Release reported that Defendant Tucker would be terminated without cause from his role as the Company's Chief Medical Officer ("CMO").

10.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or

recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company possessed inadequate control and procedures to ensure that its third-party manufacturers were in compliance with cGMP regulations when producing its drugs; (2) the Company's inadequate oversight of third-party manufacturers would increase the likelihood that its clinical studies would become confounded; (3) the confounding of the Company's clinical studies would negatively impact the viability of its products, namely briquilimab; (4) as a result of the Company's inadequate oversight of third-party manufacturers, its financial prospects were overstated; and (5) the Company's inadequate oversight of third-party manufacturers and overstated financial prospects increased the likelihood that it would have to implement disruptive measures to reduce costs. As a result of the foregoing, the Individual Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11.     In light of the Individual Defendants' misconduct—which has subjected the Company, its President and Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO") and Corporate Secretary, and its CMO to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

12.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial

likelihood of the directors' liability in this derivative action and of Defendant Martell's, Defendant Cross's, and Defendant Tucker's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

18.     Plaintiff is a current shareholder of Jasper. Plaintiff has continuously held Jasper common stock at all relevant times.

### Nominal Defendant Jasper

19.    Jasper is a Delaware corporation with principal executive offices at 2200 Bridge Pkwy Suite #102, Redwood City, California 94065. Jasper's common stock trades on the Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "JSPR."

**Defendant Martell**

20.    Defendant Martell has served as the Company's President and CEO and as a Company director since March 2022.

21.    The Schedule 14A the Company filed with the SEC on May 19, 2025 (the "2025 Proxy Statement") stated the following about Defendant Martell:

> Mr. Martell has served as our President, Chief Executive Officer and a member of our Board since March 2022. Mr. Martell has more than 30 years' experience building and managing unique businesses in the biotech industry. Mr. Martell has served as a Director of MorphImmune, Inc. since April 2021, and served as the Chief Executive Officer and President from April 2021 to March 2022. Prior to joining MorphImmune, Inc., Mr. Martell served as the President and CEO of Nuvelution Pharma, Inc. from November 2019 to March 2021. He was also the Co-Founder and Executive Chairman of Indapta Therapeutics, Inc. from April 2017 to March 2022. Mr. Martell was the Co-Founder and Executive Chairman of Orca Bio from January 2016 to June 2019 and the Co-Founder and CEO of Achieve Life Sciences, Inc. from March 2015 to December 2017, where he led the merger of the company with OncoGenex Pharmaceuticals, Inc. in August 2017. He served on the board of directors of Plus Therapeutics, Inc. (previously Cytori Therapeutics, Inc.) (Nasdaq: PSTV) from December 2016 until December 2019. He served as Chief Executive Officer of Sevion Therapeutics, Inc. from June 2014 to January 2015 and Executive Chairman of KaloBios Pharmaceuticals, Inc. from February 2015 to October 2015. Prior to Sevion, Mr. Martell was President and CEO of NeurogesX, Inc. from January 2012 to July 2013 and sold the company's assets to Acorda Therapeutics, Inc. Prior to NeurogesX, he was Chief Executive Officer of Poniard Pharmaceuticals, Inc. from February 2010 to March 2013. Before joining Poniard, he served in the capacity of the Office of the CEO and as Senior Vice President of Commercial Operations at ImClone Systems. Mr. Martell built ImClone Systems' Commercial Operations and field sales force to market and commercialize Erbitux® with partners Bristol-Myers Squibb and Merck KGaA. Prior to joining ImClone Systems, Mr. Martell worked for 10 years at Genentech, Inc. in a variety of

positions, the last of which was Group Manager, Oncology Products. At Genentech, he was responsible for the launch of Herceptin® for metastatic HER-2 positive breast cancer and Rituxan® for non-Hodgkin's lymphoma. Mr. Martell began his career at Roche Pharmaceuticals. We believe that Mr. Martell is qualified to serve as a member of our Board because of his depth of experience in oncology and cell therapy development and commercialization, as well as deep relationships across the industry.

**Defendant Cross**

22.    Defendant Cross has served as the Company's CFO and Corporate Secretary since September 2023.

23.    The 2025 Proxy Statement stated the following about Defendant Cross:

Mr. Cross has served as our Chief Financial Officer and Corporate Secretary since September 2023. Previously, Mr. Cross had served as the Chief Financial Officer of Atreca, Inc., a biotechnology company, since February 2019. From November 2017 to June 2018, he served as Chief Financial Officer of ARMO Biosciences, Inc., a biotechnology company. From February 2016 to November 2017, Mr. Cross served as Chief Financial Officer of Balance Therapeutics, Inc., a biotechnology company. From October 2013 to November 2015, he served as Chief Financial Officer of KaloBios Pharmaceuticals, Inc., a biotechnology company, and interim Chief Executive Officer from January 2015 to November 2015. In December 2015, KaloBios filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. KaloBios emerged from Chapter 11 in July 2016. From November 2010 to June 2013, Mr. Cross served as Chief Financial Officer of Affymax, Inc., a biotechnology company. He served as a director of Apexigen, Inc. from July 2022 to August 2023 and Apexigen America, Inc. from October 2019 to August 2023. Mr. Cross received a B.S. in Business Administration from the University of California, Berkeley and is a certified public accountant (inactive).

**Defendant Tucker**

24.    Defendant Tucker served as the Company's CMO from June 2023 to August 1, 2025.

25.    The 2025 Proxy Statement stated the following about Defendant Tucker:

Dr. Tucker has served as our Chief Medical Officer since June 2023. He has

8

over 30 years of clinical experience leading novel drug development. Dr. Tucker was most recently Chief Medical Officer at Goldfinch Bio, where he led clinical development and helped build the regulatory, medical affairs and clinical operations functions. Previously, he served as Chief Medical Officer at Mirum Pharmaceuticals, where he contributed to the achievement of key milestones in the development of medicines for adult and pediatric cholestatic liver disease, including the first FDA approval for Alagille Syndrome. Prior to joining Mirum, Dr. Tucker was at Acerta Pharma LLC, now part of the AstraZeneca family of companies, ultimately serving as Chief Operating Officer. Prior to joining Acerta, he held leadership positions in development, medical safety and medical affairs at Genentech, Janssen Research and Development and Bayer HealthCare Pharmaceuticals. Dr. Tucker is a member of the Royal College of Physicians (UK) and received his M.B.A. from the University of Connecticut. Dr. Tucker holds degrees in Pharmacology and Medicine from the University of Leeds, United Kingdom. Additionally, he serves as a managing director at Golden Seeds, an investment firm dedicated to pursuing early-stage investment opportunities in women-led businesses.

**Defendant Brun**

26.    Defendant Brun has served as a Company director since June 2023. Defendant Brun currently serves as the Chairperson of the Research and Development Committee and as a member of the Compensation Committee.

27.    The 2025 Proxy Statement stated the following about Defendant Brun:

Dr. Brun has served as a member of our Board since June 2023. Dr. Brun is currently President at Gold Mast Consulting, LLC, an advisory firm he founded in 2019 to provide technical advice and strategic guidance related to biopharmaceutical research and development, pipeline portfolio management, commercialization of new therapeutics and strategic communications related to R&D activities. Dr. Brun serves as a Venture Partner at Abingworth LLP and a Senior Medical Advisor to Launch Therapeutics. Prior to his current roles, Dr. Brun had two decades of experience in various leadership roles at AbbVie, Inc., including 15 years at the predecessor company, Abbott Laboratories. The majority of his career has been focused on leading teams and clinical development organizations across a broad variety of therapeutic areas including autoimmune, neurologic and renal, among others. He was most recently Corporate Vice President of Scientific Affairs and Head of AbbVie Ventures, a corporate venture fund responsible for investment opportunities within AbbVie's R&D therapeutic areas as well as technology

platforms of interest from March 2016 to March 2019. Previously, Dr. Brun served as Corporate Vice President and Head of Pharmaceutical Development at AbbVie from November 2013 to March 2016. During his tenure at AbbVie, Dr. Brun oversaw a global organization with responsibilities for AbbVie's entire portfolio of early- and late-stage clinical pre-registration pipeline compounds as well as marketed compounds within oncology, neurology, immunology, renal, infectious disease, and women's and men's health therapeutic areas. Prior to joining AbbVie, Dr. Brun spent over 15 years at Abbott Laboratories, where he held positions of increasing leadership responsibility in drug development within the R&D organization. Dr. Brun is a member of the boards of directors of Axial Biotherapeutics, Inc. and Trishula Therapeutics, Inc., both private, clinical-stage biopharmaceutical companies, Forte Biosciences, Inc. (Nasdaq: FBRX), a preclinical-stage company focused on autoimmune diseases, and Cabaletta Bio, Inc. (Nasdaq: CABA), a clinical-stage biotechnology company focused on the discovery and development of engineered T cell therapies for autoimmune diseases. Previously, Dr. Brun served as a Senior Advisor to the business development team at Horizon Therapeutics plc (Nasdaq: HZNP) from 2020 to 2023. Dr. Brun received his B.S. in Biochemistry from the University of Illinois at Urbana-Champaign and earned his M.D. from the Johns Hopkins University School of Medicine. He completed his residency in ophthalmology at the Massachusetts Eye and Ear Infirmary, Harvard Medical School. We believe that Dr. Brun is qualified to serve as a member of our Board because of his extensive background in research, development and commercialization of product candidates, as well as his current and prior service with pharmaceutical and biotechnology companies on matters pertaining to strategy and operations.

**Defendant Emster**

28.    Defendant Emster has served as a Company director since September 2021. Defendant Emster currently serves as the Chairperson of the Nominating and Corporate Governance Committee, as a member of the Audit Committee, as a member of the Compensation Committee, and as a member of the Research and Development Committee.

29.    The 2025 Proxy Statement stated the following about Defendant Emster:

Mr. von Emster has served as a member of our Board since September 2021. Mr. von Emster served on the Pre-Merger Board (as defined below) from November 2019 to September 2021. Mr. von Emster has been a Partner at

Abingworth LLP, a venture capital firm, since January 2015 and as Managing Partner since July 2015. Prior to joining Abingworth, Mr. von Emster was a co-founder and Partner of venBio LLC, a venture capital firm, from May 2009 until January 2015. In 2001, Mr. von Emster became a General Partner at MPM Capital, a leading biotechnology private equity firm, and launched the MPM BioEquities Fund, a crossover public and private biotechnology hedge fund. He was the portfolio manager of this fund from inception in 2001 until his departure in 2009. Mr. von Emster's investment career started in 1989 at Franklin Templeton Investments where he founded and managed several health and biotechnology funds in the 1990s. Mr. von Emster has served on the boards of directors of Tizona Therapeutics, Inc. since November 2020, Orbus Therapeutics, Inc. since July 2020, Launch Therapeutics since August 2021, SFJ Pharmaceuticals Inc. since April 2020 and Iambic Therapeutics since November 2023. He previously served as a director of CymaBay Therapeutics, Inc. (Nasdaq: CBAY) from April 2009 until its acquisition by Gilead Sciences, Inc. in March 2024, CRISPR Therapeutics AG from March 2015 to June 2019, Vera Therapeutics, Inc. (Nasdaq: VERA) from November 2020 to May 2022, Vaxcyte, Inc. (Nasdaq: PCVX) from June 2019 to June 2022 and Trishula Therapeutics, Inc. from December 2020 to November 2021. Mr. von Emster holds a B.S. in Business and Economics from the University of California, Santa Barbara and is a Chartered Financial Analyst (CFA). We believe that Mr. von Emster is qualified to serve as a member of our Board because of his extensive financial and investment experience, as well as his experience serving on the boards of directors of other therapeutic and pharmaceutical companies.

**Defendant Kapoor**

30.     Defendant Kapoor has served as a Company director since February 2023. Defendant Kapoor currently serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.

31.     The 2025 Proxy Statement stated the following about Defendant Kapoor:

Mr. Kapoor has served as a member of our Board since February 2023. He has been a Partner of Avego Management, LLC, an affiliate of Velan Capital Partners LP, since January 2021, leading their life sciences venture investing strategy. He was previously with Amplitude Healthcare Acquisition Corporation from January 2020 until our merger with it in September 2021. Prior to that, Mr. Kapoor was Chief Business Officer of Iveric bio, Inc. (formerly known as Ophthotech) from April 2015 to December 2019. At

Iveric bio, Inc., he was responsible for acquiring an industry-leading portfolio of gene therapy and therapeutic assets in ophthalmology. From October 2014 to April 2015, Mr. Kapoor was Director of Corporate Development at NPS Pharmaceuticals, Inc., which Shire PLC acquired in 2015 for approximately $5.2 billion. From 2005 to 2014, Mr. Kapoor spent nine years at Genentech, Inc. in various positions, including leading strategy for ophthalmology and central nervous system pipeline assets, Lucentis marketing, commercial assessments for business development and medical affairs. In addition, Mr. Kapoor has previously worked at Pfizer Inc. Mr. Kapoor received an MBA in Finance and Management from Columbia Business School in 2004 and a B.A. in Biology from Columbia University in 1997. We believe that Mr. Kapoor is qualified to serve as a member of our Board in light of his years of experience in the life sciences industry, including with respect to acquisition, strategy, marketing and business development.

### **Defendant Lucas**

32.    Defendant Lucas has served as a Company director since June 2024. Defendant Lucas currently serves as a member of the Nominating and Corporate Governance Committee.

33.    The 2025 Proxy Statement stated the following about Defendant Lucas:

Dr. Lucas has served as a member of our Board since June 2024. Dr. Lucas has served as the Chief Business Officer at Scribe Therapeutics Inc., a genetic medicine company, since June 2019, where she established multiple strategic collaborations with pharmaceutical companies, including Sanofi and Prevail Therapeutics, a subsidiary of Eli Lilly and Company. Previously, she served as Senior Vice President, Business Development at Tizona Therapeutics, Inc. ("Tizona"), a clinical-stage immunotherapy company, from January 2019 to June 2019, and prior to that as Vice President, Business Development from June 2015 to January 2019, where she was responsible for the company's business development strategy and transactions, including a global strategic collaboration with AbbVie Inc. Before joining Tizona, Dr. Lucas was Head of Oncology and Inflammation External R&D Team at Amgen Inc. from August 2014 to July 2015 where she oversaw business development activities, including Amgen's strategic cancer immunotherapy research collaboration and licensing agreement with Kite Pharma, and collaborated with Amgen Ventures on several investments in oncology and inflammation. Dr. Lucas joined Amgen following the acquisition of Onyx Pharmaceuticals, Inc., where she served as a Director, Corporate Development from September 2012 to

August 2014 and spearheaded the company's oncology partnering strategy and due diligence of new opportunities. She held positions of increasing responsibility in strategy, business development, and strategic marketing at Amgen from January 2003 to September 2005, PDL BioPharma/Facet Biotech (acquired by Abbvie) from September 2005 to July 2010, and XOMA Corporation from July 2010 to September 2012. From February 2001 to January 2003, Dr. Lucas was a strategy consultant in the Life Sciences practice of McKinsey & Company, Inc. She received her undergraduate degree in Biology from Moscow State University, and her Ph.D. in Molecular Biology and Biochemistry from the California Institute of Technology. Dr. Lucas has served on the board of directors of aTyr Pharma, Inc. (Nasdaq: ATYR) since June 2019 and as an advisor to Radar Therapeutics since October 2023. We believe that Dr. Lucas is qualified to serve as a member of our Board due to her extensive business development experience in the biotherapeutics industry.

**Defendant Nolet**

34.    Defendant Nolet has served as a Company director since September 2021. Defendant Nolet currently serves as the Chairperson of the Audit Committee and as Chairperson of the Compensation Committee.

35.    The 2025 Proxy Statement stated the following about Defendant Nolet:

Mr. Nolet has served as a member of our Board since September 2021. Mr. Nolet has more than 44 years of experience in various leadership roles in the audit services profession and in the life sciences industry. Mr. Nolet was an audit partner at Ernst & Young LLP ("EY"), a professional services firm, from November 2001 to June 2019. While at EY, Mr. Nolet led the West EY Life Sciences Industry Group. He served on both the Executive Committee and Finance Committee (Chair) of the California Life Sciences industry association from 2000 through February 2024. Mr. Nolet was also a member of the Finance & Investment Committee and Emerging Companies Section of BIO (the Biotechnology Innovation Organization). Prior to EY, Mr. Nolet was a partner at PricewaterhouseCoopers LLP from 1991 to 2001. Mr. Nolet holds a B.S. in Accounting from San Diego State University and is a retired Certified Public Accountant in California. Mr. Nolet has served on the board of directors of Revance Therapeutics, Inc. (Nasdaq: RVNC) from July 2019 to its acquisition in February 2025, and currently serves on the board of directors of ArriVent Biopharma, Inc. (Nasdaq: AVBP) since September 2023. He was previously on the board of directors of PolarityTE, Inc.

(Nasdaq: PTE) from April 2020 to January 2023 and on the board of directors of Ambrx Biopharma Inc. (Nasdaq: AMAM) from January 2021 to November 2021. Mr. Nolet also served on the board of directors of Viela Bio, Inc. (Nasdaq: VIE) from August 2019 until it was acquired in March 2021. We believe that Mr. Nolet is qualified to serve as a member of our Board because of his experience with multiple life sciences companies ranging from growing venture-capital-backed start-ups to Fortune 100 companies, and his financial expertise as a former audit partner and retired California Certified Public Accountant.

**Defendant Shizuru**

36.    Defendant Shizuru has served as a Company director since September 2021. Defendant Shizuru currently serves as a member of the Research and Development Committee.

37.    The 2025 Proxy Statement stated the following about Defendant Shizuru:

Dr. Shizuru has served as a member of our Board since September 2021. Dr. Shizuru is our scientific co-founder and served as a member of the board of directors of our Company prior to the merger with Amplitude Healthcare Acquisition Corporation (the "Pre-Merger Board") from March 2018 to September 2021 and as Chair of its Scientific Advisory Board from December 2019 to September 2021. Dr. Shizuru is a Professor of Medicine (Blood and Marrow Transplantation) and Pediatrics (Stem Cell Transplantation) at Stanford. Dr. Shizuru is a member of the Stanford Blood and Marrow Transplantation and Cellular Therapy ("BMT-CT") faculty, the Stanford Immunology Program, the Stanford Cancer Institute and the Institute for Stem Cell Biology and Regenerative Medicine. Dr. Shizuru received a Bachelor's degree from Bennington College and an M.D. and Ph.D. from the Stanford University School of Medicine. She trained as a resident in adult internal medicine at the University of California, San Francisco, and in the sub-specialty of hematology at Stanford. Dr. Shizuru has been attending on the Stanford BMT-CT clinical service since 1997, and she oversees a research laboratory. Her laboratory is focused on understanding the cellular and molecular basis of resistance to engraftment of transplanted allogeneic hematopoietic cells, and the way in which bone marrow grafts modify immune responses including the induction of immune tolerance. Dr. Shizuru's laboratory has developed the translational science of anti-CD117 antibodies, and was the first to advance an anti-human CD117 antibody as a transplant conditioning agent from the laboratory to the clinic. Dr. Shizuru has over 160

publications in the fields of immunology and hematopoietic cell transplantation. We believe that Dr. Shizuru is qualified to serve as a member of our Board because of her expertise in immunology, antibody and cellular therapies, and transplant conditioning agents, as well as her knowledge of our technology and product candidates, having co-founded our Company in 2018.

**Defendant Wiggans**

38.    Defendant Wiggans has served as Chairperson of the Board since November 2023.

39.    The 2025 Proxy Statement stated the following about Defendant Wiggans:

Mr. Wiggans has served as a member of our Board and as its Chairperson since November 2023. He most recently served as the Chief Executive Officer and chair of the board of directors of Pardes Biosciences, Inc. (Nasdaq: PRDS) from March 2022 until its merger with MediPacific, Inc. in August 2023. Mr. Wiggans founded Dermira, Inc. (Nasdaq: DERM) in August 2010, and served as its Chief Executive Officer and a member of its board of directors from August 2010 and as the chairman of its board of directors from April 2014 until Dermira's acquisition by Eli Lilly and Company in 2020. From October 2007, Mr. Wiggans served as chairman of the board of directors of Peplin, Inc. and in August 2008, he became its Chief Executive Officer, serving in these positions until Peplin's acquisition by LEO Pharma Inc. in November 2009. Previously, Mr. Wiggans served as chief executive officer of Connetics USA from 1994, and as chairman of the board of directors of Connetics from January 2006 until December 2006 when Connetics was acquired by Stiefel Laboratories, Inc. From 1992 to 1994, Mr. Wiggans served as President and Chief Operating Officer of CytoTherapeutics, Inc., a biotechnology company. From 1980 to 1992, Mr. Wiggans served at Ares-Serono S.A. in various management positions, including as President of its U.S. pharmaceutical operations and Managing Director of its U.K. pharmaceutical operations. Mr. Wiggans began his career with Eli Lilly and Company. He currently serves on the board of directors of Annexon, Inc. (Nasdaq: ANNX), a position he has held since February 2017. Mr. Wiggans has previously served on the boards of various industry organizations, educational institutions and private and public companies, including service on the boards of directors of Cymabay Therapeutics, Inc. (Nasdaq: CBAY) from April 2021 until its acquisition by Gilead Sciences, Inc. in March 2024, Onyx Pharmaceuticals Inc. from March 2005 until its acquisition by Amgen Inc. in October 2013, Sangamo Biosciences, Inc. from June 2008 until June 2012, Somaxon Pharmaceuticals,

Inc. from June 2008 until May 2012, Forma Therapeutics Holdings, Inc. from September 2020 until its acquisition by Novo Nordisk A/S in October 2022, and as chairman of the board of directors of Excaliard Pharmaceuticals, Inc. from October 2010 until its acquisition by Pfizer Inc. in December 2011. Mr. Wiggans was instrumental in the formation of the Biotechnology Industry Organization and served as a member of its board of directors for many years. He is currently a member of the Board of Trustees of the University of Kansas Endowment Association. Mr. Wiggans holds a B.S. in Pharmacy from the University of Kansas and an M.B.A. from Southern Methodist University. We believe that Mr. Wiggans is qualified to serve as a member of our Board because of his leadership and business and product development expertise, as well as his extensive experience in the pharmaceutical and therapeutics industry at both the executive and board level.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

40.    By reason of their positions as officers, directors, and/or fiduciaries of Jasper and because of their ability to control the business and corporate affairs of Jasper, the Individual Defendants owed Jasper and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Jasper in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Jasper and its shareholders so as to benefit all shareholders equally.

41.    Each director and officer of the Company owes to Jasper and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

42.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Jasper, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43.    To discharge their duties, the officers and directors of Jasper were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

44.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Jasper, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

45.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

46.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and

directors of Jasper were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Jasper's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Jasper conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Jasper and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Jasper's operations would comply with all applicable laws and Jasper's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other

financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

47.     Each of the Individual Defendants further owed to Jasper and the shareholders the duty of loyalty requiring that each favor Jasper's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

48.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Jasper and were at all times acting within the course and scope of such agency.

49.     Because of their advisory, executive, managerial, directorial, and controlling positions with Jasper, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

50.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Jasper.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

51.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the

Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

53. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Jasper was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

55. At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Jasper and was at all times acting within the course and scope of such agency.

## JASPER'S CODE OF CONDUCT

56. Jasper's Code of Business Conduct and Ethics (the "Code of Conduct") states that the Company "expect[s] every employee, officer, and director to read and understand this Code and its application to the performance of his or her business responsibilities." With respect to its purpose, the Code of Conduct states that it "reflects the business

practices and principles of behavior that support [the Company's] commitment . . . "to maintaining the highest standards of business conduct and ethics."

57.    In a section titled "Legal Compliance," the Code of Conduct states the following, in relevant part:

> Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee's operating within legal guidelines and cooperating with local, regional, national and international authorities (as further described in Section 6). We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility including, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political. contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. In particular, the research and development of pharmaceutical products is subject to a number of legal and regulatory requirements, including standards related to ethical research procedures, such as regarding animal welfare and human subjects protection, proper scientific conduct and data integrity. We are committed to conducting research and development activities ethically, at the highest scientific standards, and in compliance with all applicable regulatory requirements. We expect employees to comply with all such requirements.

58.    In a section titled "Maintenance of Corporate Books, Records, Documents, and Accounts; Financial Integrity; Public Reporting," the Code of Conduct states, in relevant part:

> The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results, clinical trial or pre-clinical study results or otherwise, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, partners, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities,

revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

- employees comply with our system of internal controls; and

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

59.    In a section titled "Fair Dealing," the Code of Conduct states the following, in relevant part:

We strive to outperform our competition fairly and honestly. Advantages over our competitors are to be obtained through superior performance of our products and services, not through unethical or illegal business practices. Acquiring proprietary information from others through improper means, possessing trade secret information that was improperly obtained, or inducing improper disclosure of confidential information from past or present employees of other companies is prohibited, even if motivated by an intention to advance our interests. If information is obtained by mistake that may constitute a trade secret or other confidential information of another business, or if you have any questions about the legality of proposed information gathering, you must consult your supervisor or the Compliance Officer, as further described in Section 24.

You are expected to deal fairly with our customers, suppliers, partners, employees and anyone else with whom you have contact in the course of performing your job. Be aware that the Federal Trade Commission Act provides that "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful." It is a violation of the Federal Trade Commission Act to engage in deceptive, unfair or unethical practices and to make misrepresentations in connection with sales

activities.

60.    In a section titled "Collaborating Responsibly with Third Parties," the Code of Conduct states the following:

> We seek to engage with trustworthy third parties who can help us achieve our goals and work collaboratively to innovate and create social and economic value. Our employees are expected to perform risk reviews on third parties and obtain proper approvals prior to engagement to ensure they are ethical, qualified, reputable and accountable. You should aim to source and partner responsibly by requiring third parties to adhere to the Company's expectations and relevant laws and regulations, such as privacy and security requirements, anti-corruption laws, trade and sanction laws.

61.    In a section titled "Waivers," the Code of Conduct states the following:

> Any waiver of this Code for executive officers (including, where required by applicable laws, our principal executive officer, principal financial officer, principal accounting officer or controller (or persons performing similar functions)) or directors may be authorized only by the Board of Directors or, to the extent permitted by the rules of Nasdaq and our Corporate Governance Guidelines, a committee of the Board of Directors, and will be disclosed as required by applicable laws, rules and regulations.

62.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## JASPER'S AUDIT COMMITTEE CHARTER

63.    Jasper also maintains an Audit Committee Charter (the "Audit Committee

Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states that the purposes of the Audit Committee are to:

- oversee the accounting and financial reporting processes and the systems of internal control over financial reporting of the Company and the audits, quality and integrity of the Company's financial statements and reports;

- take, or recommend that the Board of Directors of the Company (the "Board") take, appropriate action to oversee the qualifications, independence and performance of the independent registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing other audit, review or attest services (the "Auditors");

- prepare and review the audit committee report or other disclosures required by the rules of the Securities and Exchange Commission (the "SEC") to be included in each annual meeting proxy statement and periodic reports of the Company in accordance with applicable SEC rules and regulations;

- provide oversight assistance in connection with the Company's legal, regulatory and ethical compliance programs pertaining to financial, accounting and tax matters as established by management and the Board; and

- provide oversight regarding the Company's policies with respect to risk assessment and risk management, including enterprise risk and risks pertaining to the financial, accounting and tax matters of the Company.

64.    Under the heading "Responsibilities," in a subsection titled "Audited Financial Statement Review," the Audit Committee Charter states that the Audit Committee shall have the responsibility to:

review and discuss with management and the Auditors, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC, and to recommend whether or not such financial statements should be so included. Further, auditing literature, particularly Statement on Auditing Standards No. 100 (AU Section 722), defines the term "review" to include a particular set of required procedures to be undertaken by independent auditors. The members of the Committee are not independent auditors, and the term "review" as used in this

Charter is not intended to have that meaning and should not be interpreted to suggest that the Committee members can or should follow the procedures required of auditors performing reviews of financial statements.

65.    Under the same heading, in a subsection titled "Press Releases," the Audit Committee Charter states that the Audit Committee shall have the responsibility to:

review and discuss with management and the Auditors, as appropriate, earnings press releases and press releases containing other financial information or results of operations, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chairperson may represent the entire Committee for purposes of this discussion. To the extent practicable, the Committee shall be furnished with an advance copy of each earnings release for its review prior to publication.

66.    Under the same heading, in a subsection titled "Risk Assessment and Management," the Audit Committee Charter states that the Audit Committee shall have the responsibility to:

assist the Board in overseeing the risk management of the Company, and to review and discuss with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to enterprise, financial and legal risk assessment, risk exposures and risk management, and other risks as the Company deems necessary or appropriate from time to time, including financial, accounting, operational, tax, privacy, cybersecurity, competition, legislative and regulatory developments, intellectual property, technology and facilities obsolescence, business continuity and natural and man-made disasters. The Committee shall also oversee the steps management has taken to monitor or mitigate such exposures, including periodically reviewing the Company's risk management framework, procedures and any related policies with respect to risk assessment and risk management.

67.    Under the same heading, in a subsection titled "Internal Control Over Financial Reporting," the Audit Committee Charter states that the Audit Committee shall have the responsibility to:

confer with management and the Auditors, as appropriate, regarding the

scope, design, implementation, adequacy and effectiveness of internal control over financial reporting including any special audit steps taken in the event of material control deficiencies. To review with management and the Auditors any fraud, whether or not material, that includes management or other employees who have any significant role in the Company's internal control over financial reporting and any significant changes in internal controls or other factors that could significantly affect internal controls, including any corrective actions in regard to significant deficiencies or material weaknesses. To review and recommend action relating to any report from the Auditors made pursuant to Section 10A of the Exchange Act of illegal acts which it believes are likely to have occurred and which would have an effect on the Company's financial statements, including any contingent monetary effects, such as fines, penalties and damages.

68.    Under the same heading, in a subsection titled "Proxy Report," the Audit Committee Charter states that the Audit Committee shall have the responsibility to "prepare, review and approve the audit committee report required by the rules of the SEC to be included in each annual meeting proxy statement of the Company in accordance with applicable SEC rules and regulations."

69.    Under the same heading, in a subsection titled "Report to Board," the Audit Committee Charter states that the Audit Committee shall have the responsibility to:

through the Chairperson, report to the Board with respect to all material activities of the Committee and all material issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance or independence of the Auditors, the performance of the Company's internal audit function, if any, or such other matters as the Committee deems appropriate or advisable to report to the Board from time to time, or whenever so requested by the Board.

70.    Under the heading "Amendment; Waiver; Interpretation," the Audit Committee Charter states the following, in relevant part:

This Charter is intended to serve as a framework within which the Committee may act with respect to the matters contemplated herein. It is not intended to and shall not create a set of legally binding obligations on the Board, the Committee or the Company. The Board may amend this Charter, or any

portion of it, at any time as it determines necessary or appropriate. In the event the Board or the Committee ratifies or approves any action, matter or interpretation that may be deemed to be inconsistent with the terms of this Charter or any prior charter of the Committee, this Charter and any such prior charter shall be deemed automatically amended to comport, in all respects, with such action, matter or interpretation.

71.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

72.    Jasper is a Delaware corporation chiefly engaged in the clinical-stage biotechnology industry. More specifically, the Company creates therapeutic products for the purpose of treating mast cell driven diseases.

73.    The Company's flagship product candidate is briquilimab, a potential treatment for the diseases noted above. Briquilimab is purportedly designed to block the binding of SCF to the c-Kit receptor on mast and stem cells. According to the Company, the SCF/c-Kit pathway acts as a survival signal for mast cells whose disruption may provide significant treatment benefits for patients.

74.    In November 2023, the Company initiated the BEACON Study to ascertain the efficacy of subcutaneous briquilimab for the treatment of CSU. In December 2024, the Company commenced a Phase 1b/2a clinical study to determine the efficacy of briquilimab

as a treatment for allergic asthma (the "ETESIAN Study"). Moreover, the Company has made efforts to utilize briquilimab as a treatment for severe combined immunodeficiency ("SCID") patients who undergo second stem cell transplants.

75.    The Company does not currently possess sales and marketing infrastructure, however it states in the 2024 10-K that such infrastructure may be built in North America prior to a potential launch of briquilimab. In addition, Jasper does not currently possess or operate manufacturing facilities. Instead, the Company utilizes third-party manufacturers to produce its drug candidates, "in accordance with cGMP regulations for use in [its] clinical studies."[3] According to the 2024 10-K, cGMP regulations institute a number of procedural and documentary requirements concerning record keeping, personnel and quality control, and production processes and controls.

76.    In November 2019, the Company entered into an agreement with Lonza concerning the manufacture and product quality testing of briquilimab. Under the terms of the agreement, the Lonza facility located in Slough, United Kingdom produces and tests drug substance. The Lonza facility located in Stein, Switzerland produces and tests drug product. Furthermore, PCI Pharma Services, located in San Diego, California, conducts the labelling, packaging, and storage of finished drug product.

77.    The Drug Supply Chain Security Act of 2013 (the "DCSA") was enacted by Congress for the purpose of improving and reinforcing the integrity of the U.S. pharmaceutical supply chain. Among other things, the DCSA requires that prescription drugs are labelled with unique product identifiers including "lot" numbers. Lot numbers refer to the drug "lot" or batch of product manufactured or stored under the same conditions. In the event that a drug is compromised, pharmaceutical manufacturers can trace the other drugs derived from the same batch to prevent their usage.

## FALSE AND MISLEADING STATEMENTS

### *November 30, 2023 Press Release*

---

[3] Jasper Therapeutics, Inc., ANNUAL REPORT (FORM 10-K), at 11 (Feb. 28, 2025).

78.    The Relevant Period began on November 30, 2023, when the Company issued its November 30, 2023 Press Release. The November 30, 2023 Press Release stated, in relevant part:[4]

"Dosing of the first patient in our BEACON study is an exciting milestone for Jasper as we advance the clinical development of briquilimab in mast cell diseases," said [Defendant] Tucker[.] "In addition to gathering safety data in CSU patients who are ineligible for, or refractory to, omalizumab, we expect the study to establish proof of concept for the depletion of mast cells by briquilimab in CSU. Results from the trial should also allow us to determine doses and dosing regimens for future registrational studies in the broader CSU patient population. We look forward to providing enrollment updates as we progress through the cohorts and anticipate reporting preliminary data in mid-2024."

\*\*\*

"We are pleased to announce that the first patient has been dosed in our BEACON study on a timeline consistent with our prior guidance," said [Defendant] Martell[.] "***Treating the first patient so shortly after IND clearance is a testament to the hard work and diligence that Ed and his team put into the BEACON study's launch and I'm confident in the ability of our clinical organization to continue to execute at a high level as we advance briquilimab into clinical trials in CIndU and other mast cell-driven diseases***."

***January 5, 2024 Press Release***

79.    On January 5, 2024, the Company issued a press release "[h]ighligh[ing] [r]ecent [a]ccomplishments and [k]ey [u]pcoming [m]ilestones" (the "January 5, 2024 Press Release"). The January 5, 2024 Press Release stated, in relevant part:

"2023 was a strategically important year for Jasper," said [Defendant] Martell[.] "We secured IND clearance and CTA authorization for the Phase 1b/2a BEACON study of briquilimab in CSU and successfully dosed the first patient. Additionally, we reported positive data from the Phase 1/2 trial of briquilimab in patients with Fanconi Anemia (FA) along with the final Phase 1 results in patients with acute myeloid leukemia (AML) or myelodysplastic

---

[4] Unless otherwise stated, all emphases included herein are added.

syndromes (MDS) undergoing hematopoietic cell transplant, initiated the LR-MDS Phase 1b trial, and strengthened our leadership team.

Our achievements in 2023 set the stage for a transformational year ahead with multiple key clinical milestones on the horizon across multiple indications. Specifically, we expect to present initial data from the Phase 1b/2a BEACON study in mid-2024, which will provide valuable insight into the therapeutic potential of briquilimab. We also anticipate initiating our Phase 1b/2a SPOTLIGHT study in CIndU following our recently obtained CTA authorization from the EMA, with initial data expected in the second half of the year. Finally, we expect to present data from our Phase 1b LR-MDS study in the first half of 2024."

### March 4, 2024 Earnings Press Release

80.    On March 4, 2024, the Company issued an earnings press release to announce the Company's financial results for the fourth quarter and year ended December 31, 2023, which Jasper also filed as a Current Report on Form 8-K with the SEC that same day (the "Q4/FY 2023 Earnings Press Release"). The Q4/FY 2023 Earnings Press Release stated, in relevant part:

> "***2023 was a highly productive year for Jasper, as we shifted our operational focus toward briquilimab development in mast cell driven diseases***," said [Defendant] Martell[.] "***To that end, we successfully filed and obtained regulatory clearance for our clinical programs in both CSU and CIndU, allowing the launch of our BEACON and SPOTLIGHT clinical trials in chronic urticarias. We also completed an oversubscribed $50 million financing with a syndicate of leading life science investors to strengthen our balance sheet and support development of briquilimab, extending our cash runway through the third quarter of 2025.*** As we enter a transformational and data-rich year for Jasper, we look forward to reporting initial results from our BEACON study in CSU in the third quarter of 2024 and our SPOTLIGHT study in CIndU in the second half of 2024, and expect to initiate a new clinical program in at least one additional mast cell driven indication later this year."

### March 5, 2024 Form 10-K

81.    On March 5, 2024, the Company filed an Annual Report on Form 10-K with the SEC to report the Company's financial and operational results for the year ended

December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Martell, Cross, Brun, Emster, Kapoor, Nolet, Shizuru, and Wiggans. Attached to the 2023 10-K were certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and signed by Defendants Martell and Cross certifying that the 2023 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of [the Company]."

82. Regarding the product candidate briquilimab, the 2023 10-K stated, in relevant part:

> We believe briquilimab is a unique, humanized, monoclonal antibody that targets the underlying biology of mast cell survival to potentially serve as a therapeutic to prevent mast cell driven diseases. In addition we believe briquilimab targets a key differentiation pathway for HSCs and may be developed to improve the efficacy and safety of hematopoietic stem cell transplantation. Briquilimab binds to human c-Kit, the receptor for SCF, which is expressed on the surface of various cells, including mast cells and hematopoietic stem and progenitor cells. The interaction of SCF and c-Kit is required for mast cells to survive and for HSCs to remain in the bone marrow. By blocking SCF from binding to c-Kit and disrupting these critical signals, briquilimab leads to the depletion of mast cells in the skin and the differentiation of stem cells in the bone marrow. Briquilimab is designed to bind to c-Kit with a greater affinity than SCF.
>
> ***
>
> We are focused on advancing Briquilimab in development as a chronic therapy in mast cell driven diseases such as CSU, CIndU and other mast cell driven indications currently under evaluation. We also currently have an ongoing study in LR-MDS, as well as a study as a conditioning agent to clear HSCs from the bone marrow prior to re-transplant in patients with SCID. We partnered with the National Institutes of Health (the "NIH") and Stanford University in several investigator sponsored trials for patients with a variety of diseases undergoing hematopoietic stem cell transplant.

83. Regarding the Company's strategy, the 2023 10-K stated the following, in

relevant part:

> Our goal is to develop and commercialize briquilimab as a safe and efficacious therapeutic to address the significant unmet medical need for patients suffering from mast cell driven diseases such as CSU and CIndU. As part of our strategy, we aim to:
>
> **Build a leading biotechnology company to enable cures via immune modulation**. We are bringing together a team of biotech veterans, leading academic institutions and a strong syndicate of healthcare-focused investors to achieve our vision of developing and commercializing therapeutics with a focus on mast cell driven diseases.
>
> **Advance the development of briquilimab as a chronic therapeutic targeted primarily at mast cell driven diseases**. We are focused on developing briquilimab as a repeat dose therapy for disorders of mast cells, including CSU, CIndU and additional mast cell driven indications currently under pre-clinical evaluation utilizing our proprietary Jasper Mouse.
>
> \*\*\*
>
> **Commercialize our product candidates to expand the use of effective and safe mast cell therapies for patients and physicians in our target markets**. If approved, we plan to bring our product candidates to the American, European and Japanese markets, focusing on the top physicians and accredited transplant centers and hospital-based prescribers who administer the majority of mast cell therapies.

84.    The statements in ¶¶78-83 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company possessed inadequate control and procedures to ensure that its third-party manufacturers were in compliance with cGMP regulations when producing its drugs; (2) the Company's inadequate oversight of third-party manufacturers would increase the likelihood that its clinical studies would become confounded; (3) the confounding of the Company's clinical studies would negatively impact the viability of its products, namely briquilimab; (4) as a result of the Company's inadequate oversight of third-party manufacturers, its financial prospects were overstated; and (5) the Company's inadequate oversight of third-party manufacturers and overstated

financial prospects increased the likelihood that it would have to implement disruptive measures to reduce costs. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### *2024 Proxy Statement*

85.    On April 22, 2024, Jasper filed its Schedule 14A with the SEC (the "2024 Proxy Statement"). Defendants Martell, Brun, Emster, Kapoor, Nolet, Shizuru, and Wiggans solicited the 2024 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

86.    The 2024 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-election of Defendants Martell and Nolet to the Board; (2) the ratification of the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2024; (3) the 2024 Equity Incentive Plan (the "2024 Plan"); and (4) the 2024 Employee Stock Purchase Plan.

87.    The 2024 Proxy Statement states that the under the 2024 Plan, "incentive stock options, or ISOs," may be provided "to [the Company's] employees and [its] parent and subsidiary corporations' employees," and nonstatutory stock options ("NSOs"), stock appreciation rights, restricted stock awards, restricted stock unit awards and other forms of awards" may be provided "to [the Company's] employees, directors and consultants and any of [its] affiliates' employees and consultants." According to the 2024 Proxy Statement, up to 2,000,000 shares of the Company's common stock may be issued pursuant to the exercise of incentive stock options ("ISOs") under the 2024 Plan. In addition, the 2024 Plan allotted a maximum of 783,478 shares for issuance, consisting of any shares subject to outstanding stock options and equity awards under the prior equity incentive plan which: (1) terminated or expired prior to exercise or settlement; or (2) were not issued because the award was settled in cash or was forfeited because of the failure to vest. As of June 30, 2025, 513,644 shares were available for future grant under the 2024 Plan.

88.    With respect to the Board's role in "Risk Management," the 2024 Proxy

Statement stated the following:

> Management is responsible for the day-to-day management of risks we face, while our Board, as a whole and assisted by its committees, is responsible for the oversight of risk management. In its risk oversight role, our Board has the responsibility to satisfy itself that the risk management processes designed and implemented by management are appropriate and functioning as designed.
>
> Our Board is responsible for risk oversight. Our Board believes that it is essential for effective risk management and oversight that there be open communication between management and our Board. Our Board meets with our Chief Executive Officer, Chief Financial Officer and other members of the senior management team at quarterly meetings of our Board, where, among other topics, they discuss strategy and risks facing us, as well as at such other times as they deemed appropriate.
>
> Our Audit Committee assists our Board in fulfilling its oversight responsibilities with respect to risk management in the areas of internal control over financial reporting, accounting, tax disclosure controls and procedures, enterprise risk and legal and regulatory compliance, and discusses with management and the independent auditor guidelines and policies with respect to risk assessment and risk management. Our Audit Committee also reviews our major financial, cybersecurity and information technology risk exposures and the steps management has taken to monitor and control these exposures. Our Audit Committee also monitors certain key risks on a regular basis throughout the fiscal year, such as risk associated with internal control over financial reporting and liquidity risk. Our Compensation Committee assesses risks created by the incentives inherent in our compensation policies and evaluates our compensation policies and practices that could mitigate any such risks. Our Nominating and Corporate Governance Committee assists our Board in fulfilling its oversight responsibilities with respect to the management of risk associated with board organization, membership and structure, and environmental, social and corporate governance matters. Our full Board also reviews strategic and operational risk in the context of reports from the management team, receives reports on all significant committee activities at regular meetings of our Board, and evaluates the risks inherent in significant transactions.

89.     Regarding the Code of Conduct, the 2024 Proxy Statement stated the

following:

> Our Board has adopted corporate governance guidelines that address items such as the qualifications and responsibilities of our directors and director candidates and corporate governance policies and standards applicable to us in general. In addition, our Board has adopted a code of business conduct and ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, and persons performing similar functions. Our code of business conduct and ethics is available under the "Investors-Corporate Governance" section of our website at ir.jaspertherapeutics.com/corporate-governance/documents-charters. In addition, we intend to post on our website all disclosures that are required by law or the listing standards of Nasdaq concerning any amendments to, or waivers from, any provision of the code. The reference to our website address does not constitute incorporation by reference of the information contained in or available or accessible through our website, and you should not consider it to be a part of this Proxy Statement.

90.    Under the direction and watch of Defendants Martell, Brun, Emster, Kapoor, Nolet, Shizuru, and Wiggans, the 2024 Proxy Statement was materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company possessed inadequate control and procedures to ensure that its third-party manufacturers were in compliance with cGMP regulations when producing its drugs; (2) the Company's inadequate oversight of third-party manufacturers would increase the likelihood that its clinical studies would become confounded; (3) the confounding of the Company's clinical studies would negatively impact the viability of its products, namely briquilimab; (4) as a result of the Company's inadequate oversight of third-party manufacturers, its financial prospects were overstated; and (5) the Company's inadequate oversight of third-party manufacturers and overstated financial prospects increased the likelihood that it would have to implement disruptive measures to reduce costs. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

91.    The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) although

the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

92.     As a result of Defendants Martell, Brun, Emster, Kapoor, Nolet, Shizuru, and Wiggans causing the 2024 Proxy Statement to be false and misleading, the Company shareholders voted to approve, *inter alia*, (1) the re-election of Defendants Martell and Nolet to the Board; (2) the ratification of the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2024; (3) the 2024 Plan; and (4) the 2024 Employee Stock Purchase Plan.

***May 13, 2024 Press Release***

93.     On May 13, 2024, the Company issued a press release titled "Jasper Therapeutics Announces Briquilimab Development Program in Asthma" (the "May 13, 2024 Press Release"). The May 13, 2024 Press Release stated, in relevant part:

"Asthma remains a devastating chronic disease affecting millions of patients in the US despite current treatment options," said [Defendant] Martell[.] "***We believe that briquilimab's ability to deplete mast cells in the lung may have a significant impact on disease control across all types of asthma, including patients who are not indicated for current biologic agents or who remain refractory to them***. Clinical proof of concept for the efficacy of c-Kit inhibition in asthma has been previously established with older, less specific c-Kit inhibitors, and we are excited bring the first anti-c-Kit antibody into human studies. With the anticipated launch of the Phase 1b/2a study later this year, we plan to present clinical data in the second half of 2025. ***This trial, along with our ongoing clinical studies in chronic spontaneous and chronic inducible urticarias, is the latest step in our goal of realizing briquilimab's therapeutic potential across numerous mast cell driven diseases affecting tens of millions of patients worldwide.***"

***May 14, 2024 Earnings Press Release***

94.    On May 14, 2024, the Company issued an earnings press release to announce its financial results for the first quarter of 2024 (the "Q1 2024 Earnings Press Release"). The Q1 2024 Earnings Press Release stated, in relevant part:

"We have continued to make strong progress advancing briquilimab during the first few months of the year," said [Defendant] Martell[.] "The BEACON and SPOTLIGHT studies in chronic urticarias are rapidly enrolling patients and we remain on track to disclose initial data from the studies in the third quarter of 2024 and second half of 2024, respectively. *In addition, we recently announced our intention to advance briquilimab into clinical development in asthma, an indication in which we believe mast cell depletion via c-Kit inhibition has the potential to significantly impact disease control across all subtypes of the disease. With multiple clinical data readouts on the horizon in addition to the launch of our asthma development program, we are looking forward to an exciting and milestone rich second half of the year*."

***August 13, 2024 Earnings Press Release***

95.    On August 13, 2024, the Company issued an earnings press release to announce its financial results for the second quarter of 2024 (the "Q2 2024 Earnings Press Release"). The Q2 2024 Earnings Press Release stated, in relevant part:

"*We have continued to make excellent progress advancing briquilimab during the second quarter, with patient enrollment proceeding faster than initially expected in the BEACON and SPOTLIGHT studies*," said [Defendant] Martell[.] "The strong rate of enrollment has given us the opportunity to include additional cohorts in our initial CSU data readout, and we are now planning to present results from dosing cohorts up to 240mg in the fourth quarter of this year. *While the company remains blinded to efficacy data from the study, rapid enrollment in BEACON has also given us the flexibility to expand the study to include an additional dosing cohort evaluating briquilimab at 180mg Q8W. This will enable us to generate a more robust dataset to support dose selection for our planned registrational trials in CSU without impacting their timelines*."

"*We are very pleased with the progress in the BEACON and SPOTLIGHT studies thus far*," said [Defendant] Tucker[.] "With the support of our investigators, the efforts of the Jasper team and the timely review and approval by the Independent Data Monitoring Committee (IDMC) we have been able to quickly proceed through dose escalation on the BEACON study and are

now enrolling patients at the highest dose, 240mg. ***This rapid progress and safety affirmation by the IDMC has enabled expansion of the BEACON study to obtain more clinical insights into the potential benefits of briquilimab for patients with CSU, without delaying the program***. We look forward to reviewing and presenting initial data from both the BEACON and SPOTLIGHT studies later this year, followed in early 2025 by the full study reports to be presented at a medical conference."

***September 10, 2024 Press Release***

96.    On September 10, 2024, the Company issued a press release titled "Jasper Therapeutics Announces Health Canada Clearance of Clinical Trial Application for Phase 1b/2a Study of Briquilimab" (the "September 10, 2024 Press Release"). The September 10, 2024 Press Release stated, in relevant part:

"We are excited to announce that Health Canada has issued a no objection letter allowing us to move forward with our first clinical trial evaluating briquilimab in asthma, and we look forward to commencing patient enrollment shortly," said [Defendant] Tucker[.] "***Our clinical development plan follows an established and efficient pathway beginning with a challenge study in patients with allergic asthma to enable rapid advancement of the program. We aim to demonstrate proof of concept for the depletion of mast cells with briquilimab as an effective mechanism of action in asthma and to inform potential future studies in the broader asthma population***."

*** * ***

"Clearance of the CTA for the asthma study is an important milestone for Jasper as we continue to build out our pipeline of programs evaluating briquilimab in mast cell driven diseases," said [Defenadnt] Martell[.] "***Being able to move directly to a 180mg dose in this study as a result of the dose escalation in the BEACON study is an excellent outcome as we believe that driving deep depletion of mast cells in the airways with a higher dose of briquilimab will be key to demonstrating durable clinical benefit in asthma patients***."

***November 7, 2024 Earnings Press Release***

97.    On November 7, 2024, the Company issued an earnings press release announcing its financial results for the third quarter of 2024, which it also filed as a Current

Report on Form 8-K that same day (the "Q3 2024 Earnings Press Release"). The Q3 2024 Earnings Press Release stated, in relevant part:

> "***We achieved several significant milestones in our mast cell development programs in recent months***, highlighted by positive initial data from our SPOTLIGHT study in CIndU," said [Defendant] Martell[.] "We were very excited to present our first dataset evaluating briquilimab in a mast cell disease, which showed that over 90% of patients treated in the 40mg and 120mg dose cohorts achieved a clinical response, with no serious adverse events (SAEs) and no grade 3 or higher adverse events (AEs) reported. We also made significant progress advancing our development programs in chronic urticaria and asthma with the addition of higher dose cohorts in the BEACON and SPOTLIGHT studies as well as the attainment of regulatory clearance in Canada and the EU for our asthma challenge study. We are looking forward to our next major milestone with the presentation of initial data from the BEACON study expected during the week of January 6th, 2025."

### December 2, 2024 Press Release

98.    On December 2, 2024, the Company issued a press release titled "Jasper Therapeutics Announces First Patient Dosed in Phase 1b/2a ETESIAN Clinical Study of Briquilimab in Asthma" (the "December 2, 2024 Press Release"). The December 2, 2024 Press Release stated, in relevant part:

> "***Dosing of the first patient in our ETESIAN study in asthma is a significant milestone, marking our third clinical program evaluating briquilimab in an inflammatory disease driven by unwanted mast cell activity***," said [Defendant] Tucker[.] "Following dose escalation through Part 2 of the BEACON study in CSU, we obtained regulatory clearance to move directly to a subcutaneous 180mg dose in the ETESIAN study, which we believe will drive deep mast cell depletion in the airways and enable durable clinical benefit for patients with asthma. We look forward to providing enrollment updates as we progress through the study and anticipate reporting the initial data in the second half of 2025."

### January 8, 2025 Press Release

99.    On January 8, 2025, the Company issued a press release titled "Jasper Therapeutics Reports Positive Data from BEACON Study of Briquilimab in Chronic

Spontaneous Urticaria," which it also filed as a Current Report on Form 8-K that same day (the "January 8, 2025 Press Release"). The January 8, 2025 Press Release stated, in relevant part:

> "We are very pleased to present the positive preliminary data from the BEACON study, which demonstrates the potential of briquilimab as a leading therapeutic for CSU patients," said [Defendant] Tucker[.] "The profound reduction in UAS7 from baseline in multiple cohorts, the dose dependent durability of response and the significant and prolonged drops in mean serum tryptase from baseline demonstrate the potential for deep and durable efficacy of briquilimab in CSU. ***Combined with the favorable safety profile enabled by our optimal biologic dosing approach, we believe briquilimab has demonstrated the potential to be a leading therapeutic option for patients with CSU.*** On behalf of the entire Jasper team, I'd like to thank the investigators and the patients who are participating in the study, along with their families and caregivers."

### February 27, 2025 Earnings Press Release

100.    On February 27, 2025, the Company issued an earnings press release announcing its financial results for the fourth quarter and full year 2024, which it also filed as a Current Report on Form 8-K with the SEC that same day (the "Q4/FY 2024 Earnings Press Release"). The Q4/FY 2024 Earnings Press Release stated, in relevant part:

> "***The past year has been a transformational period for Jasper, highlighted by positive data readouts from the BEACON study in CSU and the SPOTLIGHT study in CIndU, our first two clinical studies evaluating Briquilimab in mast cell diseases***," said [Defendant] Martell[.] "***Data from both studies demonstrate the ability of briquilimab to drive rapid and deep response profiles in patients with chronic urticaria, along with the potential for a favorable and differentiated safety profile. We believe the preliminary results from the BEACON study support advancing briquilimab into a pivotal program in CSU beginning with an operationally adaptive Phase 2b study that we expect to commence later this year***. Final dose selection for the Phase 2b study will be further informed by a substantial array of additional clinical data at doses of 180mg and higher coming mid-year, including results from approximately 40 additional patients in the BEACON study and SPOTLIGHT study, as well as results from approximately 30 patients in the open-label extension study."

***February 28, 2025 Form 10-K***

101.    On February 28, 2025, the Company filed the 2024 10-K. The 2024 10-K was signed by Defendants Martell, Cross, Brun, Emster, Kapoor, Lucas, Nolet, Shizuru, and Wiggans. Attached to the 2024 10-K were SOX certifications signed by Defendants Martell and Cross certifying that the 2024 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [2024 10-K] fairly presents, in all material respects, the financial condition and results of operations of [the Company]."

102.    The 2024 10-K contained substantively similar discussions of briquilimab and the Company's strategy as referenced and identified, *supra*, in ¶¶81-83.

***May 12, 2025 Earnings Press Release***

103.    On May 12, 2025, the Company issued an earnings press release announcing its financial results for the first quarter of 2025, which it also filed as a Current Report on Form 8-K with the SEC that same day (the "Q1 2025 Earnings Press Release"). The Q1 2025 Earnings Press Release stated, in relevant part:

> "***During the first quarter of 2025 we made great progress advancing briquilimab toward important data readouts later this year from all three of our clinical programs in mast cell diseases***," said [Defendant] Martell[.] "Updated data from the BEACON study in CSU presented at the AAAAI annual meeting continued to demonstrate the potential of briquilimab to deliver differentiated onset of action, depth of response, and tolerability. We look forward to our mid-year data update in the first half of Q3 2025, which will include additional CSU patients treated in the BEACON study and in the open-label extension study. These data will inform final dose selection for our planned Phase 2b study, expected to commence in the fourth quarter of 2025. We also remain on track to present additional data from the SPOTLIGHT study in CIndU in the second quarter as well as initial data from the ETESIAN study in asthma in the second half of 2025."

104.    The statements in ¶¶93-103 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company possessed inadequate control and procedures to ensure that its third-party manufacturers were in compliance with cGMP

regulations when producing its drugs; (2) the Company's inadequate oversight of third-party manufacturers would increase the likelihood that its clinical studies would become confounded; (3) the confounding of the Company's clinical studies would negatively impact the viability of its products, namely briquilimab; (4) as a result of the Company's inadequate oversight of third-party manufacturers, its financial prospects were overstated; and (5) the Company's inadequate oversight of third-party manufacturers and overstated financial prospects increased the likelihood that it would have to implement disruptive measures to reduce costs. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### *2025 Proxy Statement*

105.   On May 19, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Martell, Brun, Emster, Kapoor, Lucas, Nolet, Shizuru, and Wiggans solicited the 2025 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

106.   The 2025 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-election of Defendants Brun, Emster, and Kapoor to the Board; (2) the ratification of the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2025; (3) on an advisory basis, the compensation of the named executive officers; and (4) on an advisory basis, the frequency of future advisory votes on the compensation of the named executive officers.

107.   With respect to the Board's role in "Risk Management," the 2025 Proxy Statement stated the following:

> Management is responsible for the day-to-day management of risks we face, while our Board, as a whole and assisted by its committees, is responsible for the oversight of risk management. In its risk oversight role, our Board has the responsibility to satisfy itself that the risk management processes designed and implemented by management are appropriate and functioning as designed. Our Board is responsible for risk oversight. Our Board believes that

it is essential for effective risk management and oversight that there be open communication between management and our Board. Our Board meets with our Chief Executive Officer, Chief Financial Officer and other members of the senior management team at quarterly meetings of our Board, where, among other topics, they discuss strategy and risks facing us, as well as at such other times as they deem appropriate.

Our Audit Committee assists our Board in fulfilling its oversight responsibilities with respect to risk management in the areas of internal control over financial reporting, accounting, tax disclosure controls and procedures, enterprise risk and legal and regulatory compliance, and discusses with management and the independent auditor guidelines and policies with respect to risk assessment and risk management. Our Audit Committee also reviews our major financial, cybersecurity and information technology risk exposures and the steps management has taken to monitor and control these exposures. Our Audit Committee also monitors certain key risks on a regular basis throughout the fiscal year, such as risk associated with internal control over financial reporting and liquidity risk. Our Compensation Committee assesses risks created by the incentives inherent in our compensation policies and evaluates our compensation policies and practices that could mitigate any such risks. Our Nominating and Corporate Governance Committee assists our Board in fulfilling its oversight responsibilities with respect to the management of risk associated with board organization, membership and structure, and environmental, social and corporate governance matters. Our full Board also reviews strategic and operational risk in the context of reports from the management team, receives reports on all significant committee activities at regular meetings of our Board, and evaluates the risks inherent in significant transactions.

108. Regarding the Code of Conduct, the 2025 Proxy Statement stated the following:

Our Board has adopted corporate governance guidelines that address items such as the qualifications and responsibilities of our directors and director candidates and corporate governance policies and standards applicable to us in general. In addition, our Board has adopted a code of business conduct and ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, and persons performing similar functions. Our code of business conduct and ethics is available under the "Investors-Corporate Governance" section of our website at ir.jaspertherapeutics.com/corporate-

governance/documents-charters. In addition, we intend to post on our website all disclosures that are required by law or the listing standards of Nasdaq concerning any amendments to, or waivers from, any provision of the code. The reference to our website address does not constitute incorporation by reference of the information contained in or available or accessible through our website, and you should not consider it to be a part of this Proxy Statement.

109. Under the direction and watch of Defendants Martell, Brun, Emster, Kapoor, Lucas, Nolet, Shizuru, and Wiggans, the 2025 Proxy Statement was materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company possessed inadequate control and procedures to ensure that its third-party manufacturers were in compliance with cGMP regulations when producing its drugs; (2) the Company's inadequate oversight of third-party manufacturers would increase the likelihood that its clinical studies would become confounded; (3) the confounding of the Company's clinical studies would negatively impact the viability of its products, namely briquilimab; (4) as a result of the Company's inadequate oversight of third-party manufacturers, its financial prospects were overstated; and (5) the Company's inadequate oversight of third-party manufacturers and overstated financial prospects increased the likelihood that it would have to implement disruptive measures to reduce costs. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

110. The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

111. As a result of Defendants Martell, Brun, Emster, Kapoor, Lucas, Nolet,

Shizuru, and Wiggans causing the 2025 Proxy Statement to be false and misleading, the Company shareholders voted to approve, *inter alia*, (1) the re-election of Defendants Brun, Emster, and Kapoor to the Board; (2) the ratification of the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2025; (3) on an advisory basis, the compensation of the named executive officers; and (4) on an advisory basis, the frequency of future advisory votes on the compensation of the named executive officers.

## **THE TRUTH EMERGES**

112.   The truth emerged on July 7, 2025, when the Company issued the July 7, 2025 Press Release. The July 7, 2025 Press Release stated, in relevant part:

> Jasper [. . .] is reporting updated data from Company's BEACON Phase 1b/2a study of subcutaneous briquilimab in adult participants with CSU and providing an update on the program. Briquilimab administration resulted in deep and rapid disease control in the 240mg and 360mg single-dose cohorts, with 8 of 9 (89%) of participants enrolled across both cohorts achieving a complete response, and with 7 of 9 (78%) achieving a clinical response by week 2. In addition, BEACON participants who rolled over into the open-label extension study dosing at 180mg Q8W demonstrated robust clinical efficacy with 8 of 11 (73%) participants achieving a complete response at 12 weeks.
>
> ***Results from the 240mg Q8W and the 240mg followed by 180mg Q8W dose cohorts appear to be confounded by an issue with one drug product lot used in those cohorts, with 10 of the 13 patients dosed with drug from the lot in question. The Company is investigating the drug product lot in question and expects to have the results of that investigation in the coming weeks. Key observations noted in those 10 patients were lower than expected drops in mean tryptase levels and no discernable impact on UAS7 scores. The 2 participants enrolled in the cohorts that have been confirmed as being dosed with drug product from a different lot both achieved complete response***.
>
> ***
>
> ***The Company has also determined that the drug product lot in question was used to treat participants enrolled in the ETESIAN trial evaluating***

*briquilimab in asthma. As a result, and in order to focus resources on advancing briquilimab in CSU, the Company is halting the study and pausing development in asthma. In addition, the Company is halting development in SCID and will be implementing a number of other cost cutting measures, including a potential restructuring, to extend runway and reduce expenses.*

"We were pleased that results from the 240mg and 360mg single dose cohorts continue to indicate that briquilimab treatment can lead to deep and durable disease control in patients with CSU," said [Defendant] Martell[.] "We are also very excited by the performance of the 180mg Q8W dose in the open label extension study with the strong efficacy observed, in combination with the encouraging safety data, supporting a differentiated profile. While we are very disappointed by the confounded results seen in the two multi-dose cohorts of the BEACON study, we are currently investigating the cause and are taking steps to ensure that drug product from the lot in question is returned to the Company and that sites have drug product from other lots to continue dosing. We plan to enroll an additional 10-12 patients across the two impacted cohorts to inform final dose selection for the Phase 2b study, *and will be implementing a number of cost cutting measures to reduce burn and extend our cash runway in light of this delay*."

113.    Market analysts swiftly took note of Jasper's July 7, 2025 Press Release, such as BMO Capital Markets. Indeed, on July 7, 2025, BMO Capital Markets published a report titled "Downgrade to Mkt; Manuf Issue Adds High Uncertainty to an Already Ambiguous Story." The BMO Capital Markets report stated, in relevant part:

**Bottom Line:**
Management update on Briquilimab's CSU trial includes: (1) 240mg/360mg single-dose data suggesting plateauing exposure/efficacy; (2) 240mg and 240mg/180mg Q8W efficacy/safety data, likely confounded by product lot issues; (3) Preliminary 180mg Q8W OLE data, in line with blinded data. Although the new data appear somewhat encouraging, *the potential manufacturing issue, and underlying uncertainty/questions, make it challenging to separate the signal from the noise. Given the market environment and previous setback here, we believe investors won't feel comfortable coming back to the story following today's update*. Downgrading to Market Perform, PT to $4.

\*\*\*

1

2    *The use of lot A34954 Briquilimab material challenges assessments of*
     *efficacy/safety profile in 240mg and 240mg/180mg Q8W cohorts.* Lot
3    A34954 material shows lack of efficacy on UAS7 (N=10) *following*
     *Briquilimab 240mg single-dose vs. 88% CR (N=7/8) with other lots,*
4    *preventing clear assessment of the drug effect. Similarly, Briquilimab safety*
     *evaluation is challenged by the inclusion of lot A34954-treated patients.* We
5    await further updates on lot A34954 in the coming weeks.

6

7                                  ***

8    **We downgrade JSPR to Market Perform to reflect high uncertainty**
9    **around Briquilimab development.** *Although today's data appear*
     *somewhat encouraging, we believe potential Briquilimab drug lot issues,*
10   *coupled with existing uncertainty around dose-response [], will pressure the*
     *JSPR story moving forward given: (1) JSPR's financing overhang (runway*
11   *to 4Q25), wherein 240mg and 240mg/180mg Q8W data are now expected by*
12   *4Q25; (2) Development delays vs. competitor CLDX (CSU PhIII enrollment*
     *completion by summer 2026) and competition from SNY following BPMC*
13   *acquisition []; (3) Market's high sensitivity (and low tolerance) around*
     *ambiguous updates*[.]
14

15   114.   On this news, the price of the Company's stock fell $3.73 per share, or
16
     approximately 55.1%, from a closing price of $6.77 per share on July 3, 2025, to close at
17
     $3.04 per share on July 7, 2025.
18
                        **SUBSEQUENT DEVELOPMENTS**
19
     115.   After the close of the Relevant Period, on July 9, 2025, the Company issued
20
     the July 9, 2025 Press Release. The July 9, 2025 Press Release stated, in relevant part:
21

22   Jasper [. . .] today announced a corporate reorganization to extend its cash
     runway, *including a workforce reduction of approximately 50%. As part of*
23   *the reorganization, [Defendant Tucker[.] is departing as Jasper's [CMO],*
     and Daniel Adelman, M.D., a member of Jasper's Scientific Advisory Board,
24   will assume the role of Acting [CMO]. *In order to focus resources on the*
25   *development of briquilimab in chronic urticaria, Jasper is halting its other*
     *clinical and preclinical programs.*
26

27                                 ***

28

**Corporate Updates and Revised Guidance**

• Jasper has refined its operating plan to focus on its briquilimab programs in chronic urticaria, ***and as a result has executed a workforce reduction of approximately 50% of its current employees***.

• In order to focus on developing briquilimab in chronic urticaria and completing the BEACON, SPOTLIGHT and open label extension studies, Jasper is ***halting its other clinical and preclinical programs, including the ETESIAN study in asthma, the SCID study and the ongoing investigator-sponsored studies. Jasper no longer plans to initiate additional mast cell focused clinical development program this year***.

• ***[Defendant] Tucker is departing his role as [CMO] effective August 1, 2025***. Dr. Daniel Adelman, an experienced clinical development executive and member of Jasper's scientific advisory board, will assume the role of Acting [CMO] as of that date.

## DAMAGES TO JASPER

116. As a direct and proximate result of the Individual Defendants' conduct, Jasper has lost and will continue to lose and expend many millions of dollars.

117. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

118. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

119. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

120.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

121.    As a direct and proximate result of the Individual Defendants' conduct, Jasper has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

122.    Plaintiff brings this action derivatively and for the benefit of Jasper to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Jasper, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

123.    Jasper is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

124.    Plaintiff is, and has been at all relevant times, a shareholder of Jasper. Plaintiff will adequately and fairly represent the interests of Jasper in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

125.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

126.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Jasper's Board consisted of the following eight individuals: Defendants Martell, Brun, Emster, Kapoor, Lucas, Nolet, Shizuru, and Wiggans (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director-Defendants that were on the Board at the time this action was filed.

127.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

128.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Jasper to issue materially false and misleading statements. Specifically, the Director-Defendants caused Jasper to issue false and misleading statements which were intended to make Jasper appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

129.   In addition, seven of the Director-Defendants, in soliciting the false and misleading 2024 Proxy Statement, caused shareholders to vote to approve the 2024 Plan which, *inter alia*, allotted a maximum of 2,000,000 shares of the Company's common stock for issuance on the exercise of ISOs. In addition, the 2024 Plan allotted a maximum of 783,478 shares for issuance, consisting of any shares subject to outstanding stock options and equity awards under the prior equity incentive plan which: (1) terminated or expired prior to exercise or settlement; or (2) were not issued because the award was settled in cash or was forfeited because of the failure to vest. As of June 30, 2025, 513,644 shares of Company stock were available for future grant under the 2024 Plan. Thus, the Individual Defendants, including the Director-Defendants, were provided the opportunity to receive material personal benefits in the future pursuant to the 2024 Plan. For these reasons too,

1

2

demand on the Director-Defendants is futile, and, therefore, excused.

3       130.   Additional reasons that demand on Defendant Martell is futile follow.

4 Defendant Martell has served as the Company's President, CEO, and as a Company

5 director since March 2022. The Company provides Defendant Martell with his principal

6 occupation for which he receives handsome compensation. Thus, as the Company admits,

7 he is a non-independent director. As Jasper's CEO and one of its trusted directors,

8 Defendant Martell was ultimately responsible for all of the false and misleading statements

9 and omissions that were made by or on behalf of the Company during the Relevant Period,

10 including those which he personally signed such as the Company's 2023 10-K, 2024 10-

11 K, and the associated SOX certifications. Defendant Martell solicited the 2024 Proxy

12 Statement, which contained false and misleading statements and resulted in, *inter alia*, the

13 re-election of Defendant Nolet and himself to the Board, thereby allowing them to continue

14 breaching their fiduciary duties to the Company. Additionally, Defendant Martell, as a

15 Company director, benefits materially from the shares made available for payment under

16 the 2024 Plan which stockholders approved on the basis of the materially false and/or

17 misleading 2024 Proxy Statement. Defendant Martell also solicited the 2025 Proxy

18 Statement, which contained false and misleading statements and resulted in, *inter alia*, the

19 re-election of Defendants Brun, Emster, and Kapoor to the Board, thereby allowing them

20 to continue breaching their fiduciary duties to the Company. As the Company's highest

21 officer during the Relevant Period, he conducted little, if any, oversight of the scheme to

22 cause the Company to make false and misleading statements, consciously disregarded his

23 duties to monitor internal controls over reporting and engagement in the scheme, and

24 consciously disregarded his duties to protect corporate assets. In addition, during the

25 Relevant Period, he failed to correct and/or personally made the false and misleading

26 statements alleged herein. Moreover, Defendant Martell is named as a defendant in the

27 Securities Class Action. For these reasons too, Defendant Martell breached his fiduciary

28 duties, faces a substantial likelihood of liability, is not independent or disinterested, and

thus demand upon him is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant Brun is futile follow. Defendant Brun has served as a Company director since June 2023. He also serves as the Chairperson of the Research and Development Committee and as a member of the Compensation Committee. Defendant Brun signed the materially false and misleading 2023 10-K and 2024 10-K. Defendant Brun also solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Martell and Nolet to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Additionally, Defendant Brun, as a Company director, benefits materially from the shares made available for payment under the 2024 Plan which stockholders approved on the basis of the materially false and/or misleading 2024 Proxy Statement. Defendant Brun also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Emster, Kapoor, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Brun breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132.    Additional reasons that demand on Defendant Emster is futile follow. Defendant Emster has served as a Company director since September 2021. He also serves as the Chairperson of the Nominating and Corporate Governance, as a member of the Audit Committee, as a member of the Compensation Committee, and as a member of the Research and Development Committee. Defendant Emster signed the materially false and misleading 2023 10-K and 2024 10-K. Defendant Emster also solicited the 2024 Proxy

Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Martell and Nolet to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Additionally, Defendant Emster, as a Company director, benefits materially from the shares made available for payment under the 2024 Plan which stockholders approved on the basis of the materially false and/or misleading 2024 Proxy Statement. Defendant Emster also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Brun, Kapoor, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Emster breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133.    Additional reasons that demand on Defendant Kapoor is futile follow. Defendant Kapoor has served as a Company director since February 2023. He also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Kapoor signed the materially false and misleading 2023 10-K and 2024 10-K. Defendant Kapoor also solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Martell and Nolet to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Additionally, Defendant Kapoor, as a Company director, benefits materially from the shares made available for payment under the 2024 Plan which stockholders approved on the basis of the materially false and/or misleading 2024 Proxy Statement. Defendant Kapoor also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of

Defendants Brun, Emster, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Kapoor breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.   Additional reasons that demand on Defendant Lucas is futile follow. Defendant Lucas has served as a Company director since June 2024. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Lucas signed the materially false and misleading 2024 10-K and also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Brun, Emster, and Kapoor to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Additionally, Defendant Lucas, as a Company director, benefits materially from the shares made available for payment under the 2024 Plan which stockholders approved on the basis of the materially false and/or misleading 2024 Proxy Statement. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Lucas breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

135.   Additional reasons that demand on Defendant Nolet is futile follow. Defendant Nolet has served as a Company director since September 2021. He also serves as the Chairperson of the Audit Committee and as the Chairperson of the Compensation

Committee. Defendant Nolet signed the materially false and misleading 2023 10-K and 2024 10-K. Defendant Nolet also solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendant Martell and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Additionally, Defendant Nolet, as a Company director, benefits materially from the shares made available for payment under the 2024 Plan which stockholders approved on the basis of the materially false and/or misleading 2024 Proxy Statement. Defendant Nolet also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Brun, Emster, and Kapoor to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Nolet breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136.    Additional reasons that demand on Defendant Shizuru is futile follow. Defendant Shizuru has served as a Company director since September 2021. She also serves as a member of the Research and Development Committee. In addition, Defendant Shizuru provides non-employee consulting services to the Company. Thus, as the Company admits, she is not an independent director. Defendant Shizuru signed the materially false and misleading 2023 10-K and 2024 10-K. Defendant Shizuru also solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Martell and Nolet to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Additionally, Defendant Shizuru, as a Company director, benefits materially from the shares made

available for payment under the 2024 Plan which stockholders approved on the basis of the materially false and/or misleading 2024 Proxy Statement. Defendant Shizuru also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted, in, *inter alia*, the re-election of Defendants Brun, Emster, and Kapoor to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Shizuru breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

137.   Additional reasons that demand on Defendant Wiggans is futile follow. Defendant Wiggans has served as the Chairperson of the Board since November 2023. Defendant Wiggans signed the materially false and misleading 2023 10-K and 2024 10-K. Defendant Wiggans also solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Martell and Nolet to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Additionally, Defendant Wiggans, as a Company director, benefits materially from the shares made available for payment under the 2024 Plan which stockholders approved on the basis of the materially false and/or misleading 2024 Proxy Statement. Defendant Wiggans also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted, in *inter alia*, the re-election of Defendants Brun, Emster, and Kapoor to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate

assets. For these reasons too, Defendant Wiggans breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138. Additional reasons that demand on the Board is futile follow.

139. Defendants Nolet (as Chair), Emster, and Kapoor (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and demand is excused as to them.

140. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to make and/or cause the Company to make materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability, and

demand is futile as to them.

141.   Jasper has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Jasper any part of the damages Jasper suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

142.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

143.   The acts complained of herein constitute violations of fiduciary duties owed by Jasper's officers and directors, and these acts are incapable of ratification.

144.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Jasper. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Jasper, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring

such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

145.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Jasper to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

146.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

147.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

148.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

149.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material

fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

150.    Defendants Martell, Brun, Emster, Kapoor, Nolet, Shizuru, and Wiggans caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company possessed inadequate control and procedures to ensure that its third-party manufacturers were in compliance with cGMP regulations when producing its drugs; (2) the Company's inadequate oversight of third-party manufacturers would increase the likelihood that its clinical studies would become confounded; (3) the confounding of the Company's clinical studies would negatively impact the viability of its products, namely briquilimab; (4) as a result of the Company's inadequate oversight of third-party manufacturers, its financial prospects were overstated; and (5) the Company's inadequate oversight of third-party manufacturers and overstated financial prospects increased the likelihood that it would have to implement disruptive measures to reduce costs. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

151.    Under the direction and watch of Defendants Martell, Brun, Emster, Kapoor, Nolet, Shizuru, and Wiggans, the 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

152.    In the exercise of reasonable care, Defendants Martell, Brun, Emster, Kapoor, Nolet, Shizuru, and Wiggans should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement

were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the re-election of the Company's directors.

153.    As a result of Defendants Martell, Brun, Emster, Kapoor, Nolet, Shizuru, and Wiggans causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Martell and Nolet to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify of the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2024; (3) approve the 2024 Plan; and (4) approve the 2024 Employee Stock Purchase Plan.

154.    The Company was damaged as a result of Defendants Martell's, Brun's, Emster's, Kapoor's, Nolet's, Shizuru's, and Wiggin's material misrepresentations and omissions in the 2024 Proxy Statement.

155.    Defendants Martell, Brun, Emster, Kapoor, Lucas, Nolet, Shizuru, and Wiggans caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company possessed inadequate control and procedures to ensure that its third-party manufacturers were in compliance with cGMP regulations when producing its drugs; (2) the Company's inadequate oversight of third-party manufacturers would increase the likelihood that its clinical studies would become confounded; (3) the confounding of the Company's clinical studies would negatively impact the viability of its products, namely briquilimab; (4) as a result of the Company's inadequate oversight of third-party manufacturers, its financial prospects were overstated; and (5) the Company's inadequate oversight of third-party manufacturers and overstated financial prospects increased the likelihood that it would have to implement disruptive measures to reduce costs. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

156.   Under the direction and watch of Defendants Martell, Brun, Emster, Kapoor, Lucas, Nolet, Shizuru, and Wiggans, the 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

157.   In the exercise of reasonable care, Defendants Martell, Brun, Emster, Kapoor, Lucas, Nolet, Shizuru, and Wiggans should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the re-election of the Company's directors.

158.   As a result of Defendants Martell, Brun, Emster, Kapoor, Lucas, Nolet, Shizuru, and Wiggans causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Brun, Emster, and Kapoor to the Board; (2) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2025; (3) approve, on an advisory basis, the compensation of the named executive officers; and (4) approve, on an advisory basis, the frequency of future advisory votes on the compensation of the named executive officers.

159.   The Company was damaged as a result of Defendants Martell's, Brun's, Emster's, Kapoor's, Lucas', Nolet's, Shizuru's, and Wiggin's material misrepresentations and omissions in the 2025 Proxy Statement.

160.   Plaintiff, on behalf of Jasper, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

161.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

162.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Jasper's business and affairs.

163.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

164.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Jasper.

165.    In breach of their fiduciary duties owed to Jasper, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company possessed inadequate control and procedures to ensure that its third-party manufacturers were in compliance with cGMP regulations when producing its drugs; (2) the Company's inadequate oversight of third-party manufacturers would increase the likelihood that its clinical studies would become confounded; (3) the confounding of the Company's clinical studies would negatively impact the viability of its products, namely briquilimab; (4) as a result of the Company's inadequate oversight of third-party manufacturers, its financial prospects were overstated; and (5) the Company's inadequate oversight of third-party manufacturers and overstated financial prospects increased the likelihood that it would have to implement disruptive measures to reduce costs. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

166.    In further breach of their fiduciary duties, the Individual Defendants failed to

correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

167.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

168.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Jasper's securities.

169.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Jasper's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

170.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

171.    As a direct and proximate result of the Individual Defendants' breaches of

their fiduciary obligations, Jasper has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

172.   Plaintiff, on behalf of Jasper, has no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

173.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

174.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Jasper.

175.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Jasper that was tied to the performance or artificially inflated valuation of Jasper, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

176.   Plaintiff, as a shareholder and a representative of Jasper, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

177.   Plaintiff, on behalf of Jasper, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

178.   Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

179. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Jasper, for which they are legally responsible.

180. As a direct and proximate result of the Individual Defendants' abuse of control, Jasper has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

181. Plaintiff, on behalf of Jasper, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

182. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Jasper in a manner consistent with the operations of a publicly held corporation.

184. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Jasper has sustained and will continue to sustain significant damages.

185. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

186. Plaintiff, on behalf of Jasper, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

187. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the

Company.

189.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Jasper to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

190.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

191.    Plaintiff, on behalf of Jasper, has no adequate remedy at law.

<u>**SEVENTH CLAIM**</u>
**Against Defendants Martell, Cross, and Tucker for Contribution Under Sections 10(b) and 21D of the Exchange Act**

192.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.    Jasper and Defendants Martell, Cross, and Tucker are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Martell's, Cross's, and Tucker's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

194.    Defendants Martell, Cross, and Tucker, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

195.    Accordingly, Defendants Martell, Cross, and Tucker are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D

of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

196. As such, Jasper is entitled to receive all appropriate contribution or indemnification from Defendants Martell, Cross, and Tucker.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Jasper, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Jasper;

(c) Determining and awarding to Jasper the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Jasper and the Individual Defendants to take all necessary actions to reform and improve Jasper's corporate governance and internal procedures to comply with applicable laws and to protect Jasper and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Jasper to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations;

(e)     Awarding Jasper restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.


Dated: November 5, 2025              Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

<u>/s/</u><u>Robert C. Moest</u>
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

## **<u>VERIFICATION</u>**

I, Ričardas Bardauskas, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4 day of November, 2025.

Signed by:

_____
EE975223C5EC444...
Ričardas Bardauskas